Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email: blarsen@shea.law
        kwyant@shea.law

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>OLIVER ANDREAS HEMMERS; and<br>ANNE PANTELAS;<br><br><br>Debtors. | Case No: 23-15674-abl<br><br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES<br>LITIGATION FINANCE FUND<br>INTERNATIONAL SP;<br><br>            Plaintiff,<br><br>v.<br><br>ANNE PANTELAS; OLIVER HEMMERS;<br><br>            Defendants. | Adversary Case No.:<br><br>**COMPLAINT FOR**<br>**NONDISCHARGEABILITY AND**<br>**OBJECTION TO DISCHARGE** |

Plaintiff HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP ("Plaintiff" or "HASelect"), by and through its counsel, Shea Larsen PC, hereby submits its Adversary Complaint and claims and alleges against Defendant ANNE PANTELAS ("Pantelas"), Defendant OLIVER HEMMERS ("Hemmers" and collectively with Pantelas, "Defendants") as follows:

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**PARTIES**

1.      Plaintiff HASelect is, and was at all relevant times, a segregated portfolio company of HedgeACT International SPC Ltd., a Cayman Islands corporation, with its principal place of business in Illinois.

2.      Pantelas is, and was at all relevant times, a resident of and domiciled in the state of Nevada.

3.      Hemmers is, and was at all relevant times, a resident of and domiciled in the state of Nevada.

**JURISDICTION AND VENUE**

4.      This Adversary Complaint for nondischargeability, and the claims herein, are brought pursuant to 28 U.S.C. § 1334(b) and (d), in that it arises in or is related to the above-captioned case under Chapter 7, title 11, of the United States Code. This is a core proceeding pursuant to 28 U.S.C. § 157 because it seeks, among other things, a determination of nondischargeability of particular debts within the meaning of § 157(b)(2)(I) and objects to discharge within the meaning of § 157(b)(2)(J).

5.      HASelect consents to the entry of final orders and judgment by the Bankruptcy Court.

**GENERAL ALLEGATIONS**

**A. HASelect Loaned Money to Defendants' Entity and Obtained a Security Interest in All Related Personal Property.**

6.      At all relevant times up to the chapter 7 bankruptcy filing of Infinity Capital Management, Inc. ("Infinity") on September 14, 2021, Defendants were the sole owners, officers, and directors of Infinity.

7.      Prior to its chapter 7 bankruptcy filing, Infinity operated a business in which it purchased accounts receivable ("Receivables") from medical providers at a discount with the general expectation that Infinity would receive more than the purchase price at the time of collection.

8.      Such Receivables generally arose from medical treatment provided to individuals who were injured in accidents and had asserted personal injury claims. These Receivables were generally secured by liens against such personal injury claims and were typically paid at the time

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

2

the personal injury claims were settled.

9.    Starting in late 2018, Defendants solicited HASelect to loan several million dollars to Infinity to be used by Infinity for the purchase of accounts receivable and offered to grant HASelect a first-priority security interest in substantially all of Infinity's assets, including its accounts receivable, to secure such loan.

10.    As a result of Defendants' solicitations and after several months of discussions and negotiations, HASelect agreed to make a loan to Infinity (the "Loan").

11.    On or about February 26, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Loan and Security Agreement and Promissory Note (the "Loan Agreement") pursuant to which HASelect agreed to loan up to $5,000,000 to Infinity to be used by Infinity for the purchase of Receivables.

12.    In the Loan Agreement, Infinity granted HASelect a security interest in all of Infinity's existing and after acquired personal property (as defined in § 4.1 of the Loan Agreement, the "Collateral") to secure payment of all indebtedness owed in connection with the HASelect Loan. HASelect perfected this security interest through the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.

13.    On or about June 23, 2019, HASelect and Infinity entered into an Amendment 1 to Loan and Security Agreement and Promissory Note by which they agreed to increase the amount of the HASelect Loan by $1,000,000.

14.    On or about August 30, 2019, HASelect and Infinity entered into a First Amended & Restated Loan Agreement and Promissory Note, which superseded all prior written loan agreements and promissory notes entered into between HASelect and Infinity, by which they agreed, among other things, to increase the amount of the HASelect Loan to $15,000,000.

15.    On or about December 18, 2019, HASelect and Infinity entered into a Second Amended & Restated Loan Agreement and Promissory Note (together, with all prior and related loan documents, the "Loan Agreement"), which again superseded all prior written loan agreements

3

and promissory notes entered into between HASelect and Infinity, by which they agreed, among other things, to increase the amount of the HASelect Loan to $30 million.

**B. Defendants Fraudulently Obtained Excess Loan Proceeds from HASelect.**

16.    Beginning on March 4, 2019 and continuing through April 30, 2020, HASelect disbursed proceeds of the HASelect Loan to Infinity through periodic draws requested by Infinity that were subject to verification and approval by FTM.  HASelect funded twenty-one (21) such draw requests on the dates and in the amounts set forth below.

| Draw Request | Date Funded | Funded Amount |
|---|---|---|
| HAS-01 | 3/4/2019 | $250,000.00 |
| HAS-02 | 4/2/2019 | $500,000.00 |
| HAS-02 | 4/3/2019 | $250,000.00 |
| HAS-03 | 5/1/2019 | $485,500.00 |
| HAS-04 | 5/20/2019 | $547,000.00 |
| HAS-05 | 6/19/2019 | $662,500.00 |
| HAS-06 | 7/24/2019 | $421,000.00 |
| HAS-07 | 6/28/2019 | $750,000.00 |
| HAS-08 | 7/15/2019 | $1,621,500.00 |
| HAS-09 | 8/26/2019 | $901,500.00 |
| HAS-10 | 9/30/2019 | $676,500.00 |
| HAS-11 | 10/31/2019 | $178,500.00 |
| HAS-12 | 10/22/2019 | $704,000.00 |
| HAS-13 | 11/15/2019 | $50,000.00 |
| HAS-14 | 12/13/2019 | $510,000.00 |
| HAS-15 | 11/12/2019 | $159,000.00 |
| HAS-16 | 11/29/2019 | $249,000.00 |
| HAS-18 | 12/30/2019 | $3,200,000.00 |
| HAS-19 | 1/30/2020 | $1,223,000.00 |
| HAS-20 | 2/28/2020 | $303,000.00 |
| HAS-21 | 3/30/2020 | $989,000.00 |
| HAS-22 | 4/30/2020 | $465,000.00 |

$15,096,000.00

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

17.     To obtain a draw under the Loan, Infinity was required to submit a written draw request signed by one of the Defendants along with a list of the Receivables that Infinity was to acquire with the proceeds of the draw.

18.     March 4, 2019 and continuing through April 30, 2020, Infinity submitted at least 21 separate draw requests to HASelect in which it sought the disbursement of Loan proceeds in the amounts set forth above.

19.     Each such draw request was signed by either Hemmers or Pantelas as officers of Infinity.

20.     Each such draw request expressly represented to HASelect that the purpose of the draw request was to obtain Loan proceeds that Infinity would use to purchase Receivables.

21.     Each such draw request sought the disbursement of Loan proceeds in an amount that matched the purported cost of the Receivables identified in corresponding lists of Receivables submitted to HASelect with the draw requests.

22.     Each such draw request also expressly represented that Infinity had satisfied all conditions necessary for a disbursement to be made under the Loan Agreement, which included the requirement that the value of the Receivables to be acquired with the Loan proceeds be at least 200% of the amount disbursed to Infinity.

23.     HASelect relied upon such representations as set forth in each of Infinity's draw requests, as executed by Hemmers and Pantelas, in disbursing Loan proceeds to Infinity.

24.     Following Infinity's chapter 7 bankruptcy filing, HASelect learned that the Infinity draw requests signed by Hemmers and Pantelas routinely and intentionally overstated both the cost and the value of Receivables in order to fraudulently obtain excess Loan proceeds to use for purposes other than the acquisition of Receivables.

25.     For example, Infinity submitted draw request HAS-18 signed by Pantelas to HASelect in December 2019 in which it requested that HASelect disburse Loan proceeds in the amount of $3,200,000 to be used by Infinity to purchase Receivables from HealthPlus Imaging ("HealthPlus").

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

26.     The HAS-18 draw request was accompanied by a list of the Receivables to be acquired that represented that the Receivables would be purchased at a total cost of $3,200,051.89 and that the Receivables held a collective value of $11,690,968.46.

27.     Hemmers and Pantelas did not disclose to HASelect that the actual purchase price for these Receivables, as agreed to in writing between Infinity and HealthPlus, was $2,500,000, not $3,200,051.89 as represented in the HAS-18 draw request signed by Pantelas.

28.     Additionally, Pantelas had previously been advised by Infinity staff by email in October 2019 that the total value of the Receivables to be purchased from HealthPlus was less than $5,000,000, not $11,690,968.46 as represented in the HAS-18 draw request signed by Pantelas and not 200% of the amount of Loan proceeds requested by Infinity as represented by Pantelas as required under the Loan Agreement.

29.     Upon receipt of the full $3,200,000 requested under the HAS-18 draw request, Hemmers and Pantelas caused Infinity to pay only $1,750,000 of the $2,500,000 purchase price to HealthPlus and used the remaining Loan proceeds disbursed by HASelect to pay bonuses to themselves, to pay personal living expenses, and to pay indebtedness owed to creditors other than HASelect in violation of the Loan Agreement.

30.     As another example, Infinity submitted draw request HAS-22 signed by Hemmers to HASelect on or about April 27, 2020 in which it requested that HASelect disburse Loan proceeds in the amount of $465,000 to be used by Infinity to purchase Receivables from various medical providers, including dozens of Receivables to be purchased from Cuevas Diagnostics, LLC d/b/a Stat Diagnostics ("Stat Diagnostics").

31.     Under Infinity's written contract with Stat Diagnostics, Infinity paid Stat Diagnostics $600 for each Receivable arising from a magnetic resonance imaging ("MRI") scan performed by Stat Diagnostics and received a refund of that payment along with an additional fee at the time of collection of the Receivable that varied based on how much time passed prior to collection. At most, Infinity was entitled to receive a refund of its $600 payment and a maximum fee of $480, for a total of $1,080, for each such Receivable.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

32.     The list of Receivables that Infinity submitted to HASelect in support of draw request HAS-22 represented the cost of each Receivable acquired from Stat Diagnostics to be $840, not the $600 purchase price actually paid by Infinity.  Additionally, this list of Receivables represented the value of each Receivable acquired from Stat Diagnostics to be as much as $4,500, not the maximum amount of $1,080 that Infinity was actually entitled to collect under its contract with Stat Diagnostics.  The cost and value of the remaining Receivables included in draw request HAS-22 were similarly overstated.

33.     As a result of the fraudulent overstatement of the value and cost of the Receivables included in draw request HAS-22, Infinity received more than $150,000 in excess Loan proceeds that it used for purposes other than the acquisition of Receivables as represented to HASelect.

34.     Each draw request signed by Hemmers and Pantelas and submitted to HASelect materially and intentionally overstated both the cost and the value of the Receivables Infinity submitted to HASelect for funding.

35.     Of the total $15,096,000 in total Loan proceeds disbursed to Infinity based on draw requests signed by Hemmers and Pantelas, less than $9,000,000 was actually used by Infinity to purchase Receivables as represented to HASelect.

36.     Hemmers and Pantelas caused Infinity to use the excess Loan proceeds advanced by HASelect to pay bonuses and make loans to Hemmers and Pantelas and to pay personal living expenses instead of using such proceeds to pay for the purchase of Receivables as represented to HASelect in the various draw requests signed by Hemmers and Pantelas.

37.     Hemmers and Pantelas, contrary to their representations to HASelect, misappropriated more than $3,000,000 in Loan proceeds advanced to Infinity by HASelect to pay debts purportedly owed by Infinity to Coastal Investments, PLC ("Coastal"), which is a Cook Islands limited company.  Hemmers and Pantelas were the majority owners of Coastal at the time such payments were received by Coastal and, thus, personally benefited from such payments.

38.     In order to conceal their misconduct and prolong their ability to fraudulently obtain excess Loan proceeds from HASelect as described herein, Hemmers and Pantelas repeatedly caused

Infinity to fail to provide financial reporting to HASelect as required under the Loan Agreement and repeatedly refused HASelect's requests to inspect Infinity's books and records as allowed under the Loan Agreement.

39.     HASelect relied on the representations made in the draw requests signed by Hemmers and Pantelas in disbursing Loan proceeds to Infinity and would not have made such disbursements had it known that such draw requests were materially false as described herein.

40.     As a result of Hemmers and Pantelas' fraudulent representations as to the cost and value of Receivables submitted to HASelect for funding, the value of the Collateral available to HASelect upon Infinity's chapter 7 bankruptcy filing was significantly less than represented to HASelect by Hemmers and Pantelas and less than the indebtedness owed to HASelect in connection with the Loan.

**C. Hemmers and Pantelas Intentionally and Maliciously Harmed HASelect by Misappropriating Loan Collateral and Funds Owed to HASelect.**

41.     In or around June 2020, Hemmers and Pantelas caused Infinity to terminate its borrowing relationship with HASelect in favor of a new funding relationship with Tecumseh-Infinity Medical Receivables Fund, LP ("Tecumseh").

42.     Beginning on June 26, 2020 and continuing through at least October 4, 2020, Hemmers and Pantelas caused Infinity to enter into at least seven (7) different assignments and bills of sale with Tecumseh by which Infinity sold to Tecumseh over 2,400 Receivables in which HASelect held a perfected, first-priority security interest as Collateral for the Loan.

43.     Infinity received over $1,200,000 from Tecumseh for the sale of such Receivables to Tecumseh but did remit any portion of these sales proceeds to HASelect in payment of the Loan.

44.     In selling such Receivables to Tecumseh, Hemmers and Pantelas intentionally caused Infinity to materially breach the Loan Agreement.

45.     Pursuant to the Loan Agreement, Infinity was required to deposit all proceeds collected on Receivables to a dedicated deposit account at First Savings Bank (the "FSB Account") over which HASelect held control of disbursements and from which payments due under the Loan Agreement were remitted to HASelect.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

8

46.    All such proceeds were included within the Collateral and were subject to HASelect's perfected security interest under the Loan Agreement.

47.    In or around July 2021, Hemmers and Pantelas intentionally caused Infinity to cease deposits of proceeds collected on Receivables to the FSB Account and to, instead, deposit such proceeds in one or more separate Infinity deposit accounts at Nevada State Bank (the "NSB Accounts").

48.    Hemmers and Pantelas intentionally caused Infinity to divert $100,000 or more in proceeds collected from Receivables in which HASelect held a perfected security interest to the NSB Accounts in violation of the Loan Agreement during July, August, and September 2021.

49.    Hemmers and Pantelas intentionally caused Infinity to use such diverted proceeds to pay personal expenses and to pay other amounts to Hemmers and Pantelas instead of remitting payment to HASelect as required under the Loan Agreement.

50.    As a result of Hemmers and Pantelas' intentional misappropriation of HASelect's Collateral for the Loan, the value of the Collateral available to HASelect upon Infinity's chapter 7 bankruptcy filing was significantly less than represented to HASelect by Hemmers and Pantelas and less than the indebtedness owed to HASelect in connection with the Loan.

**D. Hemmers and Pantelas Breached Their Fiduciary Duties to Infinity and Intentionally Misappropriated and Embezzled Infinity Assets.**

51.    On September 14, 2021, Infinity filed a voluntary chapter 7 bankruptcy petition with this Court, commencing Bankruptcy Case No. 21-14486-abl (the "Infinity Bankruptcy Case").

52.    On October 15, 2021, the Bankruptcy Court also entered an Order in the Infinity Bankruptcy Case [ECF No. 97] granting HASelect and the chapter 7 trustee's joint motion to approve abandonment of the Collateral to HASelect (the "Abandonment Order").

53.    On October 15, 2021, the Bankruptcy Court also entered an Order in the Infinity Bankruptcy Case [ECF No. 96] granting HASelect's motion for relief from the automatic and permitting HASelect to immediately take possession and control of the Collateral, wherever it may be located, and to otherwise enforce its security interest and rights in the Collateral consistent with its rights under the Loan Agreement and applicable law (the "Relief Order").

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

54.     The Collateral abandoned to HASelect includes all claims held by Infinity against third parties, including Defendant Hemmers and Defendant Pantelas.

55.     At all relevant times prior to Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas were the sole officers and directors of Infinity.

56.     As officers and directors of Infinity, Hemmers and Pantelas owed fiduciary duties to Infinity.

57.     Hemmers and Pantelas breach their respective fiduciary duties to Infinity by, among other things, causing Infinity to incur excessive debt through their fraudulent representations made to HASelect as described herein, causing Infinity to use Loan proceeds for purposes other than acquiring Receivables as required under the Loan Agreement, causing Infinity to wrongfully misappropriate HASelect's Collateral, and misappropriating and embezzling Infinity assets for their own personal use, leaving Infinity with insufficient assets to repay its creditors.

58.     In further violation of their fiduciary duties to Infinity; Hemmers and Pantelas also attempted to transfer Infinity's business operations to a new company they formed prior to Infinity's chapter 7 bankruptcy filing, Infinity Health Solutions, LLC ("IHS").

59.     On or about September 2, 2020, Hemmers and Pantelas formed IHS as a Nevada limited liability company.

60.     Hemmers and Pantelas were, at all relevant times, the sole managers of IHS and collectively own 100% of the membership interests in IHS.

61.     IHS did not engage in any material business transaction with any third party prior to the filing of Infinity's chapter 7 bankruptcy case.

62.     Shortly before the filing of Infinity's chapter 7 bankruptcy case, Hemmers and Pantelas copied and transferred to IHS substantially all of Infinity's electronic business records, including records relating to Infinity's accounts receivable, Infinity's contracts with third parties, Infinity's employees, Infinity's software and computer systems, Infinity's websites and data portals, and Infinity's business operations among other things.

63.     On September 2, 2021, Infinity employee Robert Land sent an email to Hemmers

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

with the subject line "Cloud Migration Update" in which he advised Hemmers that he had copied Infinity's electronic records to a new server, was able to run Infinity's proprietary case manager software on the new server and had attempted to install Infinity's websites on the new server but was unable to do so.

64. On September 10, 2021, Infinity employee Robert Land sent an email to Hemmers with the subject line "RX Portal on Solutions is working" in which he advised Hemmers that Infinity's websites and customer portals were functional through IHS's new website www.infinityhealth.solutions and that he had not yet made "the changes we discussed yesterday [to] the company and domain name."

65. One day before the filing of Infinity's chapter 7 bankruptcy case, Infinity employee Robert Land sent an email to Hemmers with the subject line "Name Replacements" in which advised that he was updating Infinity's electronic records to add IHS's name in place of Infinity. Specifically, Land advised "'Infinity Health' will be changed to 'Infinity Health Solutions'" and "'Infinity Capital' will be changed to 'Infinity Health Solutions'". Hemmers responded to this email within a few minutes instructing Land to also change "the old name Infinity Health Connections" to "Infinity Health Solutions".

66. On the day of Infinity's chapter 7 bankruptcy filing, Infinity employee Robert Land sent an email to Hemmers with the subject line "Move Status" in which he discussed the status of his efforts to copy and transfer Infinity's electronic records to IHS. Among other things, Land represented that Infinity's "[d]atabase has been copied and set up", the "Infinity Health folder has been copied from [Infinity's server]", and "PI and RX Portals with FileManager are working (infinityhealth.com changed to infinityhealth.solutions where appropriate)".

67. All Infinity records copied and transferred to IHS are included within and remain part of HASelect's Collateral and are subject to HASelect's perfected security interest under the Loan Agreement.

68. On or about the day of Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas caused certain equipment owned by Infinity and included within the Collateral, including laptop

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

11

computers, iPads, hard drives, and telephone equipment, to be moved from Infinity's business office to their personal residence for use by IHS.

69.    On or about the day of Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas caused other personal property owned by Infinity and included within the Collateral, including software, websites, data portals, and other general intangibles, to be transferred to IHS for use in usurping Infinity's business operations.

70.    On or about the day of Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas caused IHS to hire substantially all of the employees of Infinity in substantially the same roles and positions in which they served while employed by Infinity.

71.    Approximately a week after Infinity's chapter 7 bankruptcy filing, Hemmers emailed an "updated company roster" to several former employees of Infinity in which those employees were identified as employees of IHS. This "updated company roster" also included contact information for Infinity's prior lawyer and accountant as well as contact information for individuals associated with several companies that had previously done business with Infinity, including Tecumseh.

72.    On or about the day of Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas caused all new incoming emails sent to emails address used in connection with Infinity's business operations, including various email addresses ending in @infinitycapital.com and @infinityhealth.com, to be automatically forwarded to similar email addresses ending in @infinityhealth.solutions to be used in connection with IHS's business operations.

73.    On October 6, 2021, Hemmers sent an email to Infinity employee Robert Land with the subject line "Corrections to Statement" in which Hemmers asked Land to update the form billing statement used by Infinity to replace Infinity's name and contact information with IHS's name and contact information. Hemmers attached to this email an Infinity billing statement on which he had crossed out Infinity's name and contact information and handwritten IHS's name and contact information.

74.    On October 8, 2021, Infinity employee Robert Land sent an email to Hemmers with the subject line "Modified Template Files" in which he advised that he had modified more than 20

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

document templates previously used by Infinity to include the new logo, address, and phone numbers for IHS.

75.     On or about the day of Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas caused numerous vendor accounts used by Infinity to be transferred to IHS, including vendor accounts established with AdvanStaffHR, Adobe, GoDaddy, Equiinet, Slack, Tailormade Servers, and others.

76.     On or about the day of Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas and other IHS employees began contacting third parties that had previously done business with Infinity to request that those third parties enter into new contracts with IHS.

77.     On or about the day of Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas caused IHS to begin entering into new written contracts with third parties that had previously entered into written contracts with Infinity, including new contracts with Peachtree Orthopedic, Perimeter Orthopedics, ColdCo Therapies, ExpressCHEX, Georgia Spine and Orthopedics, Paid Care Center of Georgia, and others.  The contracts entered into by IHS with such third parties are substantially similar to the contracts previously entered into between such third parties and Infinity.

78.     Following Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas continued to communicate with and accept payment from various third parties responsible for payment of accounts receivable included in HASelect's Collateral in interference of HASelect's rights and its efforts to service and collect such accounts receivable.

79.     From approximately June 2020 through the Petition Date, Infinity sold a substantial number of accounts receivable to Tecumseh for which Infinity provided collection services following the sale.

80.     HASelect is informed and believes, and thereon alleges, that following Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas used IHS to continue providing substantially the same collection services as previously provided by Infinity to Tecumseh.

81.     As part of such collection services, Hemmers and Pantelas exchanged emails with Tecumseh regarding the status of accounts receivable as well as numerous emails with third parties

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

regarding the acceptance of discounted payments in satisfaction of accounts receivable Infinity sold to Tecumseh.

82.    Following Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas used IHS to continue selling accounts receivable to Tecumseh as evidenced by a payment from Tecumseh to IHS on October 12, 2021 in the amount of $56,590.89.

83.    Prior to Infinity's chapter 7 bankruptcy filing, Infinity operated a pharmacy card program through its website pursuant to a contract it had entered into with ExpressCHEX, LLC through which Infinity originated and purchased accounts receivable relating to purchases of prescription medication.

84.    Shortly after the Petition Date, Hemmers and Pantelas caused IHS to enter into a substantially similar contract with ExpressCHEX, LLC and to begin operating the same pharmacy card program developed by Infinity through IHS's website.

85.    Following Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas added IHS's name, logo, and contact information to marketing materials developed by Infinity and used such materials, as modified, to solicit business for IHS.

86.    HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas, in causing Infinity to file its chapter 7 case, intended to avoid repayment of debts owed to HASelect under the Loan Agreement while simultaneously converting valuable assets of Infinity included within HASelect's Collateral and using such assets to effectively transfer Infinity's business operations to IHS.

87.    HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas formed IHS for the specific purpose of continuing the business operations of Infinity under a different name in order to hinder, delay, or defraud creditors of Infinity.

88.    HASelect is informed and believes, and thereon alleges, IHS was a mere continuation or successor of Infinity, and utilizes the same employees, equipment, electronic records, documents, customer lists, marketing materials, and business model.

89.    HASelect was informed and believes, and thereon alleges, Hemmers and Pantelas, in

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

attempting to conceal their wrongful conduct in transferring Infinity's electronic records and business operations to IHS, deleted emails and other electronic documents from computers surrendered to HASelect pursuant to the Relief Order and the Abandonment Order.

90.     For example, the "Deleted Items" folders in the Infinity email accounts of Hemmers and Pantelas (and most other Infinity employees) were empty when Infinity's computers were abandoned to HASelect, indicating that emails were permanently deleted from those email accounts on or around the Petition Date.

91.     Additionally, the above-referenced emails exchanged between Hemmers and Robert Land on and around the Petition Date as well as many other similar emails, were deleted from Hemmers' Infinity email account prior to the abandonment of Infinity's computers to HASelect.

92.     HASelect is informed and believes, and thereon alleges, that, in a further attempt to conceal their wrongful conduct through IHS, Hemmers and Pantelas made several false statements while testifying under oath at Infinity's § 341 meeting of creditors on October 27, 2021.

93.     For example, when asked if IHS had entered into any contract with any party, Hemmers and Pantelas both answered "no". In fact, as of October 27, 2021, IHS had already entered into several contracts (all signed by Pantelas as manager of IHS) with parties that had previously done business with Infinity, including a contract with Peachtree Orthopedic Clinic, P.A. dated October 1, 2021, a contract with ExpressCHEX, LLC dated October 6, 2021, a contract with Georgia Spine and Orthopedics dated October 11, 2021, and several others.

94.     Similarly, when asked if they had any connection to a company named Buena Vista (a fictitious firm named used by ExpressCHEX, LLC in its dealings with Infinity), both Hemmers and Pantelas answered "no" with the exception of Infinity's pre-petition relationship with Buena Vista. Hemmers and Pantelas failed to disclose that IHS had entered into a new contract with ExpressCHEX, LLC (again doing business as Buena Vista Medical Services) on October 6, 2021 and had purchased accounts receivable from ExpressCHEX, LLC after the Petition Date.

95.     When asked if they were involved in or had any connection to any "medical lien business" other than Infinity, both Hemmers and Pantelas answered "no". In fact, as of October 27,

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

2021, IHS had entered into several contracts with medical providers relating to the purchase of accounts receivable secured by liens against personal injury claims, had sold a substantial number of such accounts receivable to Tecumseh, and had provided collection services to Tecumseh with respect to accounts receivable sold to Tecumseh by Infinity.

96.    When asked if IHS used any of the same software systems that were used by Infinity, Hemmers answered "no".  In fact, as of October 27, 2021, IHS was using the same proprietary case manager software, websites, and customer portals that had been developed and used by Infinity.

97.    When asked if IHS was in possession of any electronic records relating to Infinity, Hemmers and Pantelas testified that the only such records in IHS's possession were "backups" stored on a single hard drive that was removed from Infinity's office around the Petition Date and had not been connected to any computer system used by IHS.  In fact, as of October 27, 2021, substantially all of the electronic records stored on Infinity's data servers had been copied to new servers set up by Hemmers and Pantelas for use by IHS.

98.    When asked if they were involved in the management of any portfolio of accounts receivable, both Hemmers and Pantelas testified they were not.  In fact, as of October 27, 2021, IHS was providing collection services, including negotiating discounted payment amounts, relating to accounts receivable Infinity had sold to Tecumseh.

99.    When asked if IHS's employees were communicating with parties that had previously done business with Infinity, both Hemmers and Pantelas answered "no".  In fact, as of October 27, 2021, IHS's employees, including Hemmers and Pantelas, were actively communicating with several parties that had previously done business with Infinity.

100.    As a result of Hemmers and Pantelas' breaches of their fiduciary duties owed to Infinity as well as their misappropriation and embezzlement of Infinity Assets as described herein, the value of the Collateral available to HASelect upon Infinity's chapter 7 bankruptcy filing was significantly less than represented to HASelect by Hemmers and Pantelas and less than the indebtedness owed to HASelect in connection with the Loan.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **FIRST CAUSE OF ACTION**

### **(Exception to Discharge – 11 U.S.C. § 523(a)(2)(A))**

101.    HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

102.    Under section 523(a)(2)(A), an individual debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition."

103.    As described in detail above, Defendants each made intentional and material misrepresentations to HASelect through draw requests submitted to HASelect seeking the disbursement of Loan proceeds to Infinity for the purported purpose of purchasing Receivables when, in fact, Defendants sought to obtain excess Loan proceeds above and beyond the cost of the Receivables submitted to HASelect for financing for use for improper purposes by Infinity in violation of the Loan Agreement and for their own personal use and benefit.

104.    Among other things, Defendants intentionally and materially misrepresented both the cost and the value of Receivables presented to HASelect for funding through draw requests signed by Defendants.

105.    Defendants knew at the time they signed draw requests submitted to HASelect for funding under the Loan Agreement that the supporting documents on which the draw requests were based were materially false in that they intentionally overstated both the cost and the value of the Receivables presented to HASelect for funding.

106.    Defendants knew at the time they signed draw requests submitted to HASelect for funding under the Loan Agreement that Infinity would be unable to repay the amounts it borrowed from HASelect as required under the Loan Agreement that that Infinity would have insufficient assets to satisfy the indebtedness it owed to HASelect under the Loan Agreement as a result of Defendants' intentional and material misrepresentations regarding both the cost and the value of the Receivables presented to HASelect for funding.

107.    In the absence of Defendants' false pretenses, false representations, and actual fraud,

1  HASelect would not have disbursed Loan proceeds to Infinity in the amounts requested by

2  Defendants.

3      108.    At the time HASelect disbursed Loan proceeds to Infinity as described herein,

4  HASelect did not know that Defendants' misrepresentations were false.

5      109.    HASelect's reliance on Defendants' false representations was justified and

6  reasonable as Defendants repeatedly caused Infinity to fail to provide financial reporting to HASelect

7  as required under the Loan Agreement and refused to allow HASelect access to Infinity's books and

8  records as required under the Loan Agreement.

9      110.    HASelect has sustained damages as a result of Defendants' false pretenses, fraud, and

10  misrepresentations in an amount to be proven at trial.

11      111.    Based on the fraudulent actions of Defendants, punitive damages are appropriate to

12  the maximum amount allowed under applicable laws.

13      112.    HASelect is entitled to a judgment against Defendants stating that all amounts owed

14  to HASelect by Defendants be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

15      113.    As a result of Defendants' foregoing actions, HASelect has been required to engage

16  the services of an attorney to bring this claim and is entitled to recover its reasonable costs, attorneys'

17  fees, and interest.

18                    **SECOND CAUSE OF ACTION**

19            **(Exception to Discharge – 11 U.S.C. § 523(a)(2)(B))**

20      114.    HASelect incorporates the allegations set forth in the other sections of this Adversary

21  Complaint as if set forth at length herein.

22      115.    As described in detail above, Defendants each made intentional and material

23  misrepresentations to HASelect through draw requests submitted to HASelect seeking the

24  disbursement of Loan proceeds to Infinity for the purported purpose of purchasing Receivables

25  when, in fact, Defendants sought to obtain excess Loan proceeds above and beyond the cost of the

26  Receivables submitted to HASelect for financing for use for improper purposes by Infinity in

27  violation of the Loan Agreement and for their own personal use and benefit.

28

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

18

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

116.   Among other things, Defendants intentionally and materially misrepresented both the cost and the value of Receivables presented to HASelect for funding through draw requests signed by Defendants.

117.   Defendants knew at the time they signed draw requests submitted to HASelect for funding under the Loan Agreement that the supporting documents on which the draw requests were based were materially false in that they intentionally overstated both the cost and the value of the Receivables presented to HASelect for funding.

118.   Defendants knew at the time they signed draw requests submitted to HASelect for funding under the Loan Agreement that Infinity would be unable to repay the amounts it borrowed from HASelect as required under the Loan Agreement that that Infinity would have insufficient assets to satisfy the indebtedness it owed to HASelect under the Loan Agreement as a result of Defendants' intentional and material misrepresentations regarding both the cost and the value of the Receivables presented to HASelect for funding.

119.   In the absence of Defendants' false representations and actual fraud, HASelect would not have disbursed Loan proceeds to Infinity in the amounts requested by Defendants.

120.   At the time HASelect disbursed Loan proceeds to Infinity as described herein, HASelect did not know that Defendants' misrepresentations were false.

121.   HASelect's reliance on Defendants' false representations was justified and reasonable as Defendants repeatedly caused Infinity to fail to provide financial reporting to HASelect as required under the Loan Agreement and refused to allow HASelect access to Infinity's books and records as required under the Loan Agreement.

122.   HASelect has sustained damages as a result of Defendants' false pretenses, fraud, and misrepresentations in an amount to be proven at trial.

123.   Based on the fraudulent actions of Defendants, punitive damages are appropriate to the maximum amount allowed under applicable laws.

124.   HASelect is entitled to a judgment against Defendants stating that all amounts owed to HASelect by Defendants be excepted from discharge under 11 U.S.C. § 523(a)(2)(B).

125.    As a result of Defendants' foregoing actions, HASelect has been required to engage the services of an attorney to bring this claim and is entitled to recover its reasonable costs, attorneys' fees, and interest.

## THIRD CAUSE OF ACTION

### (Exception to Discharge for Fraud or Defalcation While Acting in a Fiduciary Capacity, Embezzlement, or Larceny – 11 U.S.C. § 523(a)(4))

126.    HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

127.    At all relevant times prior to Infinity's chapter 7 bankruptcy filing, Hemmers and Pantelas were the sole officers and directors of Infinity.

128.    As officers and directors of Infinity, Hemmers and Pantelas owed fiduciary duties to Infinity.

129.    Hemmers and Pantelas breach their respective fiduciary duties to Infinity by, among other things, causing Infinity to incur excessive debt through their fraudulent representations made to HASelect as described herein, causing Infinity to use Loan proceeds for purposes other than acquiring Receivables as required under the Loan Agreement, causing Infinity to wrongfully misappropriate and dispose of HASelect's Collateral, and misappropriating and embezzling Infinity assets for their own personal use, leaving Infinity with insufficient assets to repay its creditors.

130.    In further violation of their fiduciary duties to Infinity; Hemmers and Pantelas also attempted to transfer Infinity's business operations to IHS, a new company they formed shortly before Infinity's chapter 7 bankruptcy filing.

131.    Through the Collateral abandoned to it under the Relief Order and Abandonment Order and otherwise, HASelect is entitled to pursue claims against Defendants based on their breaches of their respective fiduciary duties to Infinity as well as their embezzlement of Infinity's assets and HASelect's Collateral.

132.    HASelect has sustained damages as a result of Defendants' wrongful conduct in an amount to be proven at trial.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

133.     Based on the fraudulent actions of Defendants, punitive damages are appropriate to the maximum amount allowed under applicable laws.

134.     HASelect is entitled to a judgment against Defendants stating that all amounts owed to HASelect by Defendants be excepted from discharge under 11 U.S.C. § 523(a)(4).

135.     As a result of Defendants' foregoing actions, HASelect has been required to engage the services of an attorney to bring this claim and is entitled to recover its reasonable costs, attorneys' fees, and interest.

**FOURTH CAUSE OF ACTION**

**(Exception to Discharge for Willful and Malicious Injury – 11 U.S.C. § 523(a)(6))**

136.     HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

137.     The actions of Defendants' as alleged herein were undertaken willfully and maliciously, within the meaning of 11 U.S.C. § 523(a)(6) with the intent to injure HASelect by altering HASelect's Collateral, knowingly attempting to give the same to third parties, refusing to provide HASelect with accurate information regarding the value of its Collateral, intentionally misrepresenting the value of HASelect's Collateral, and knowingly transferring HASelect's Collateral to third parties in an attempt to avoid payment of HASelect's loans in full.

138.     HASelect has sustained damages as a result of Defendants' intentional and malicious acts in an amount to be proven at trial.

139.     Based on the fraudulent actions of Defendants, punitive damages are appropriate to the maximum amount allowed under applicable laws.

140.     HASelect is entitled to a judgment against Defendants stating that all amounts owed to HASelect by Defendants be excepted from discharge under 11 U.S.C. § 523(a)(6).

141.     As a result of Defendants' foregoing actions, HASelect has been required to engage the services of an attorney to bring this claim and is entitled to recover its reasonable costs, attorneys' fees, and interest.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

21

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

## FIFTH CAUSE OF ACTION

**(Objection to Discharge on the Ground of False Oath and Concealment – 11 U.S.C. §**

**727(a)(4)(A) and 727(a)(2))**

142.    HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

143.    HASelect is informed and believes, and thereupon alleges, that Defendants, each of them, knowingly and fraudulently made numerous materially false representations in connection with their filing of this bankruptcy case including, without implied limitation, with respect to the Schedules of Assets and Liabilities and Statement of Financial Affairs filed December 22, 2023 (the "Schedules") [ECF No. 1].  Among other things, those materially false representations include the following false statements and omissions.

    a.    At item 7 on page 16 of 69 of the Schedules, Defendants state they hold no interest in any electronics, including televisions, radios, computers, printers, scanners, cell phones, cameras, media players, games, and other electronic devices.  HASelect is informed and believes that this statement is false.

    b.    At item 9 on page 16 of 69 of the Schedules, Defendants state they hold no interest in any equipment for sports or hobbies, including any photographic equipment, exercise equipment, bicycles, tools, musical instruments, or other hobby equipment. HASelect is informed and believes that this statement is false.

    c.    At item 12 on page 16 of 69 of the Schedules, Defendants state they hold no interest in any jewelry of any kind.  HASelect is informed and believes that this statement is false.

    d.    At item 19 on page 16 of 69, Defendants state they hold no interest in any non-publicly traded business, including any interest in any LLC, partnership or joint venture.  HASelect is informed and believes that this statement is false.

    e.    At item 26 on page 18 of 69 of the Schedules, Defendants state they own no interest in any patent, copyright, trademark, trade secret, or other intellectual property.

HASelect is informed and believes that this statement is false.

    f.    At item 43 on page 20 of 69 of the Schedules, Defendants state they hold no interest in any customer list, mailing list, or other compilation. HASelect is informed and believes that this statement is false.

    g.    At item 18 on page 58 of 69 of the Schedules, Defendants state they have not sold, traded, or otherwise transferred any property other than in the ordinary course of their financial affairs within two (2) years prior to the filing of their chapter 7 bankruptcy petition. HASelect is informed and believes that this statement is false.

    h.    At item 27 of page 60 of 69 of the Schedules, Defendants identify various business entities in which they have held an ownership interest or to which they have been connected in the four (4) years prior to the filing of their chapter 7 bankruptcy petition. Defendants' response to this item falsely states that IHS has filed a chapter 7 bankruptcy case. Defendants' response further omits Defendants' interests in and connections to Coastal as well as A & J Organic Bakery LLC.

144.    HASelect is informed and believes, and thereupon alleges, that Defendants made such materially false statements to conceal assets from creditors, including, but not limited to, HASelect.

**PRAYER FOR RELIEF**

WHEREFORE, HASelect requests judgment against Defendants as follows:

1.    For judgment against Defendants, each of them, for an amount of no less than the unpaid balance of the Loan as determined at trial, plus accrued interest;

2.    For an order determining and decreeing that all of the claims of HASelect against Defendants are not dischargeable in bankruptcy;

3.    For an order denying Defendants a discharge in this bankruptcy case;

4.    For HASelect's reasonable attorneys' fees incurred herein;

5.    For HASelect's costs of suit incurred herein;

6.    For punitive damages in the maximum amount allowed under applicable laws; and

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

7.     For such other and further relief as the Court deems just and proper.

DATED this 6th day of February 2024.

**SHEA LARSEN**

/s/ *Bart K. Larsen, Esq.*
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*